# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DARNELL DIXON, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 17 CV 1142 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| CAMERON WATSON, Warden ) | |
| Western Illinois Correctional Center,[1] ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Darnell Dixon filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising three grounds: (1) actual innocence, based on recently obtained evidence; (2) the trial court violated petitioner's Fourteenth Amendment rights by granting the state's motion in limine prohibiting petitioner's trial counsel from introducing evidence that the charges against one of petitioner's alleged accomplices had been dismissed; and (3) petitioner's trial counsel was ineffective for failing to object to the aforementioned motion in limine. Respondent filed a motion to dismiss, arguing that the petition is time-barred, but not addressing the merits of petitioner's claims. For the reasons discussed below, the court finds that the petition is not time-barred and directs respondent to respond to the merits of the petition.

---

[1] Petitioner is currently incarcerated at Western Illinois Correctional Center, and thus the court substitutes Cameron Watson, Warden of Western Illinois Correctional Center, as the respondent. See Fed. R. Civ. P. 25(d).

# BACKGROUND[2]

## I. Factual Background

On May 26, 1994, petitioner was found guilty of two counts of first degree murder and one count of home invasion. People v. Dixon, No. 92 CR 8607-03 (Cook Cnty. Cir. Ct.). Petitioner was sentenced to life imprisonment. Id. The evidence at trial showed that two individuals were found dead from gunshot wounds five days after they participated in an alleged drug deal-turned-robbery. Petitioner was friends with the robbery victims and was visiting their apartment, which was in petitioner's building, during the robbery. While investigating the murders police interviewed one of the robbery victims, and that interview led to the arrest of petitioner and an attempt to locate an alleged accomplice, Eugene Langston, whom an eyewitness picked out of a lineup as someone leaving the scene around the time of the murders.[3] Detective Michael McDermott and Assistant State's Attorney Henry Simmons interviewed petitioner after his arrest. Simmons wrote a summary of that interview, during which petitioner allegedly confessed to the murders and named Langston as an accomplice. Petitioner initialed changes Simmons made to the written summary and confession, including correcting his name from Durrell to Darnell, but ultimately refused to sign it. Petitioner testified at his trial and denied confessing to the murders, although he admitted that he was present during the drug robbery.

Prior to trial, petitioner's trial counsel moved to bar the prosecution from presenting testimony that petitioner confessed to the murders. That motion was denied. During a hearing on the motion, petitioner's counsel sought to elicit testimony regarding the police investigation

---

[2] Because petitioner has not rebutted the factual allegations set forth in the Illinois Appellate Court's opinion, the court adopts them. See 28 U.S.C. § 2254(e)(1); People v. Dixon, No. 1-08-2946 (Ill. App. Ct. 2011).
[3] That eyewitness did not identify petitioner, although he was pictured in the lineup, and later retracted his identification of Langston. Petitioner's counsel attempted to locate the eyewitness to testify, but was unable to do so. The trial court allowed into evidence the identification of Langston, but barred as hearsay the subsequent retraction.

and evidence police found that someone other than petitioner had committed the murders. The trial judge consistently sustained objections to almost all of that desired testimony. The judge subsequently granted a motion in limine brought by the state to bar testimony that someone other than petitioner confessed to the murders and did not implicate petitioner as an accomplice. Petitioner's counsel fought these decisions vehemently and kept a meticulous record of all of the trial court's rulings that he perceived as unfair to petitioner.

The state's case in chief relied primarily on the testimony of Simmons and McDermott, both of whom recounted petitioner's alleged confession in detail. Additionally, the court allowed the state to read the alleged confession into the record, and gave the unsigned written statement to the jury to use during deliberation. The state offered some corroborating evidence as well. For example, according to the alleged confession, petitioner stole a van to use as transportation to and from the crime scene. The state presented evidence that a van matching that description "disappeared" from the location where petitioner allegedly confessed to stealing it, and was recovered, with the column stripped (indicating that it had been stolen), a few blocks from petitioner's apartment. Additionally, the state called as a witness Myron Gaston. Gaston was the brother of one of the murder victims, and was present during the drug robbery. He also lived in the apartment with the two murder victims. Gaston testified that petitioner worked for the dealers who were robbed. At his trial, petitioner testified and admitted to having sold drugs for the dealers in the past, but claimed to have stopped some time before the robbery. Gaston further testified that somebody called the apartment on the morning of the murders, but the caller said nothing when Gaston answered the telephone.[4] The state called a witness from the telephone company to establish that the call came from the apartment where the drug robbery had taken place.

---

[4] Gaston left the apartment after the call and returned to find the bodies of the victims.

## II.     Procedural Posture

With the assistance of counsel, petitioner appealed his conviction, and the state appellate court affirmed on December 11, 1996.  People v. Dixon, No. 1-08-2946 (Ill. App. Ct. 2011).  Petitioner did not appeal to the Illinois Supreme Court.

Petitioner filed a pro se postconviction petition pursuant to 725 ILCS 5/122-1 et seq., on July 25, 2000, alleging ineffective assistance at both the trial and appellate levels.  Id. at 7.  That petition was also denied, after having been remanded for reasons irrelevant to the instant petition.  People v. Dixon, No. 1-00-4223 (Ill. App. Ct. 2003); Doc. 1 at 3.  Petitioner appealed that denial, and the state appellate court affirmed on April 20, 2011.  Dixon, No. 1-08-2946.  Petitioner then filed a petition for leave to appeal ("PLA") with the Illinois Supreme Court, which was denied.  Order, People v. Dixon, No. 113617 (Ill. Mar. 28, 2012).

Shortly after the state appellate court affirmed the denial of petitioner's postconviction petition pursuant to 725 ILCS 5/122-1 et seq., on June 27, 2011, petitioner filed a motion for relief from judgment pursuant to 735 ILCS 5/2-1401.  The trial court denied that motion on March 8, 2013.  Doc. 13, Exh. A at 27.  Petitioner appealed and the state appellate court affirmed on May 17, 2016.  People v. Dixon, No. 1-13-1193 (Ill. App. Ct. 2016).  Petitioner then filed a PLA, which the Illinois Supreme Court denied on September 27, 2016.  Order, Dixon v. People, No. M13767 (Ill. Sep. 27, 2016).  Petitioner filed his Section 2254 petition with this court on February 13, 2017.  Doc. 1.

# DISCUSSION

## I.     Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the standard of review applied to federal habeas corpus petitions filed under 28 U.S.C. § 2254 by persons in

4

state custody. Under the AEDPA, a petitioner has one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" to file a Section 2254 petition. 28 U.S.C. § 2244(d)(1)(A). The AEDPA does, however, allow for tolling of the one year statute of limitations: "The time during which a properly filed application for State postconviction or other collateral review . . . is pending shall not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2)(D).

Petitioner had twenty-one days to file a PLA, or an affidavit of intent to file a PLA, after the state appellate court affirmed his conviction on December 11, 1996. Ill. Sup. Ct. R. 315(b) (1996). Because petitioner failed to file either, his conviction became final, and the limitations period began to run, on January 1, 1997. Although petitioner's postconviction petition pursuant to 725 ILCS 5/122-1 et seq., would have tolled the statute of limitations, that petition was not filed until July 25, 2000 – more than three years after the statute of limitations began to run. Accordingly, petitioner's claims are time-barred and, therefore, procedurally defaulted.

Petitioner may overcome procedural default by showing that the court's failure to consider his claim would result in a fundamental miscarriage of justice. House v. Bell, 547 U.S. 518, 536 (2006); Coleman v. Thompson, 501 U.S. 722, 750 (1991). Such a showing is made where a petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 492 (1986). In the instant case, petitioner claims that newly discovered evidence proves that he is actually innocent. However, a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Schlup v. Delo, 513 U.S 298, 315 (1995). Accordingly, the

5

court turns to petitioner's actual innocence claim to determine whether it provides an equitable exception to petitioner's procedural default.

For petitioner to assert innocence as a gateway to present procedurally defaulted claims, he "must show that in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." Coleman v. Hardy, 628 F.3d 314, 319 (7th Cir. 2010) (internal quotations omitted). "[P]etitioner must support the innocence claim with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Id. (quoting Schlup, 513 U.S. at 324). The evidence need not be newly discovered, for "[a]ll Schlup requires is that the new evidence is reliable and that it was not presented at trial." Gladney v. Pollard, 799 F.3d 889, 898 (7th Cir. 2015); see also Gomez v. Jaimet, 350 F.3d 673, 680 (7th Cir. 2003) (If the evidence was "genuinely not presented to the trier of fact then no bar exists to the habeas court evaluating whether the evidence is strong enough to establish the petitioner's actual innocence."). "[B]ecause an actual-innocence claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." Jones v. Calloway, 842 F.3d 454, 461 (7th Cir. 2016) (internal quotations omitted). The court must consider "all of the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." Id. The court must then "make a probabilistic determination about what reasonable, properly instructed jurors would do" based on the newly supplemented record. Schlup, 513 U.S. at 324. (internal quotation omitted).

Additionally, the "actual-innocence standard is not deferential to the verdict." Calloway, 842 F.3d at 461. A habeas court considering actual innocence must determine "whether rational

6

jurors *would* have convicted," not whether they "*could* have convicted." Hayes v. Battaglia, 403 F.3d 935, 940 (7th Cir. 2005) (Flaum, J., concurring) (emphasis supplied). "[A] petitioner satisfies the [actual-innocence] gateway standard if his new evidence raises sufficient doubt about his guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error." Calloway, 842 F.3d at 462 (internal quotations and alterations omitted).

**II.    Analysis**

Petitioner offers two new pieces of evidence to support his innocence claim: (1) an appellate court brief in petitioner's appeal of the denial of his postconviction petition, in which the state asserted that Langston was not involved in the murders; and (2) a Special State's Attorney's report addressing officer misconduct under Commander Jon Burge that found sufficient evidence to prove guilt beyond a reasonable doubt that McDermott battered suspects and committed perjury as to their alleged confessions. According to respondent, this evidence is insufficient to allow petitioner access to the "actual innocence" gateway for his procedurally defaulted claims. The court disagrees.

Respondent is correct that an argument made in an appellate brief is not evidence. It is, however, support for evidence that was not presented to the jury at petitioner's trial and would have assuredly impacted the verdict: that the state dismissed all charges against petitioner's alleged accomplice, Eugene Langston, and that the eyewitness who identified Langston as being near the scene of the crime later recanted that identification. From the scant records provided to this court, it appears that the state relied on accomplice liability when it prosecuted petitioner. During closing arguments the prosecutor repeatedly told the jury that they could convict petitioner for his own acts, or for acts of another for whom he is legally responsible. The

7

prosecutor's argument also relied heavily on Langston's alleged conduct. The prosecutor told the jury that Langston shot through the door of the apartment, kicked it open, and then shot and killed the victims, and that petitioner was responsible for Langston's acts for having participated. It further appears that the only evidence tying Langston to the crimes was petitioner's alleged confession and the recanted eyewitness identification.

Petitioner's second piece of evidence, at the very least, undermines the state's case by highlighting its weakness, and this court "must consider all of the evidence, old and new, and based on this total record, make a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup 513 U.S. at 325. The court is disturbed by the special prosecutors' finding that "there was convincing evidence, sufficient to prove guilt beyond a reasonable doubt, that McDermott battered suspects and committed perjury about the suspects' alleged confessions." United States v. Burge, 2014 WL 201833, at *1 (N.D. Ill. Jan. 17, 2014). Although the special prosecutor's report has no direct bearing on petitioner's innocence, it seriously undermines the testimony of the state's main witness, which petitioner has disputed all along. Petitioner testified at trial that he did not confess to Detective McDermott and did not sign the written statement drafted by Simmons because it was false.

Having analyzed the new evidence petitioner has offered, the court must assess the likely impact the entire record would have on reasonable jurors and make the probabilistic determination that Schlup requires. The newly supplemented record contains the following facts: (1) petitioner was present during a drug robbery in which his friends were the victims, but was not himself robbed; (2) petitioner lived in the building where that robbery took place, but not in the actual apartment; (3) petitioner sold drugs for the robbery victims during some period of time, but claimed to have stopped prior to the robbery; (4) somebody who lived in the apartment

8

where the robbery took place, and petitioner did not live, called the victims the morning of the murders; (5) a van matching the description of a van petitioner allegedly confessed to stealing in order to carry out the murders disappeared from and reappeared at locations allegedly identified by petitioner in his confession; (6) petitioner allegedly confessed to the murders, but to a detective working under Commander Jon Burge who, according to the Special State's Attorney's report, coerced suspects into confessing and then perjured himself as to those alleged confessions; (7) there was no physical evidence tying petitioner to the crime; and (8) there were no eyewitnesses who placed petitioner, or anyone else, at or near the scene of the crime.

The first four facts indicate that petitioner was friends with, and lived near, drug dealers who were robbed and for whom petitioner worked at some point in time. The fifth fact is dubious because it came from an alleged confession that petitioner denies making and refused to sign. Although a van might have, in fact, been stolen, nothing more than petitioner's alleged confession ties petitioner to that van, and Detective McDermott could have very well known about its theft prior to taking petitioner's alleged confession. The seventh and eighth facts do not incriminate petitioner in any way, and the sixth fact was advanced by a detective whose credibility has been greatly undermined.

The state would have been required to offer "proof of shared criminal intent or participation in a common criminal design" to convict petitioner under an accountability theory. Calloway, 842 F.3d at 463 (citing People v. Redmond, 341 Ill.App.3d 498 (2003)). Accordingly, to find petitioner guilty of Langston's acts "would have required evidence that they shared a criminal intent or participated in a common criminal design," evidence which is completely lacking in the instant case. Indeed, the state ultimately dismissed all charges against the one for whom petitioner was allegedly responsible. The supplemented record does not

9

support the state's accountability theory, nor does it support petitioner's guilt. Because it is more likely than not that no rational juror would have convicted petitioner based on the newly supplemented record, petitioner's procedurally defaulted constitutional claims may "pass through the actual-innocence gateway to a merits review." Calloway, 842 F.3d at 461.

## CONCLUSION

For the reasons discussed above, the court denies respondent's motion to dismiss (Doc. 13). Respondent is directed to respond to the merits of petitioner's constitutional claims on or before October 6, 2017. Upon review of that response, the court will determine whether to assign counsel to represent petitioner in these proceedings. This matter is set for a report on status October 18, 2017, at 9:00 a.m.

**ENTER:** **August 31, 2017**

_____
**Robert W. Gettleman**
**United States District Judge**